# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 21-665V

| | |
|---|---|
| MARIE TYLER, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: September 20, 2024 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Jessi Carin Huff, Maglio Christopher & Toale, Seattle, WA, for Petitioner.*

*Camille Jordan Webster, U.S. Department of Justice, Washington, DC, for Respondent.*

## FACT RULING DISMISSING TABLE CLAIM[1]

On January 12, 2021, Marie Tyler filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a left-sided shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on October 1, 2018. Pet. at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find it more likely than not that Petitioner's injury and its residual effects lasted for more than six months. But because the onset of Petitioner's shoulder pain did not likely occur within 48 hours of vaccination, her Table

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

SIRVA claim must be dismissed (although this matter may remain viable as an off-Table causation-in-fact claim).

## I.    Relevant Procedural History

After initiating her claim, Petitioner filed her vaccination record, medical records, an affidavit, and a statement of completion on February 26, 2021. ECF Nos. 7-11. On October 26, 2021, and May 26, 2022, Petitioner filed additional medical records. ECF Nos. 25, 27. Approximately two months later, on July 20, 2022, Respondent filed a status report indicating this case was not appropriate for compensation and requesting to file a Rule 4(c) Report. ECF No. 29.

In that report (filed on October 20, 2022 (ECF No. 32)), Respondent argued that Petitioner's medical records do not show that the onset of her pain occurred within 48 hours of vaccination. Rule 4(c) Report at 6-7 (citing Ex. 7 at 15; Ex. 11 at 8). Respondent further argued that Petitioner had failed to establish the statutory requirement that her injury lasted for more than six months, and that any statements to the contrary in the medical records were likely made in contemplation of litigation. *Id.* at 9 (citing 42 U.S.C. § 300aa-11(c)(1)(D)(i); Ex. 6 at 5).

Petitioner subsequently filed a motion for a ruling on the record ("Motion") and additional witness statements, including a letter from her treating physician, on March 27, 2023. ECF Nos. 34-35. Petitioner contends that she has met her burden of proof for a Table SIRVA claim based on the record.[3] ECF No. 35. Specifically, she argues that she complained of pain attributable to her vaccination at her first post-vaccination visit and consistently thereafter. *Id.* at 9 (citing Ex. 19; Ex. 14 at 9; Ex. 8 at 4, 7, 10, 18; Ex. 6 at 3, 5; Ex. 2 at 9). She also argues that she can satisfy the six-month severity requirement because her medical records corroborate her ongoing shoulder pain linked to the flu vaccine following her return to treatment (albeit after an approximate eleven-month gap). *Id.* at 11-13.

Respondent filed his response to Petitioner's motion ("Response") on June 20, 2023. ECF No. 38. He argued that the letter provided by Petitioner's treater and the affidavits drafted by her friends and family (made for the purpose of litigation) are a "stark contrast" to the medical record evidence as to onset and should accordingly be given little weight. *Id.* at 2-3. He also maintained that Petitioner cannot satisfy the six-month severity requirement because she did not provide an explanation for her eleven-month gap in

---

[3] Petitioner also requested that if her Table SIRVA claim is unsuccessful, she alternatively be allowed to plead an off-Table causation-in-fact SIRVA claim. Motion at 13.

treatment. *Id.* at 3 (citing Ex. 9 at 12). Additionally, any of Petitioner's later complaints of shoulder pain attributable to the subject flu vaccination were "likely made for the purpose of impending litigation, given the reporting of six months with specificity in accord with the severity requirement." *Id.* (citing Ex. 6 at 5).

On June 30, 2023, Petitioner filed her reply ("Reply") and reiterated that she has met her burden for a Table SIRVA claim and has satisfied the six-month severity requirement. ECF No. 39. She asserts that estimations regarding onset in the medical records are "wrong," and that she has provided a reasonable explanation for her gap in treatment. *Id.* at 4-6. This matter is now ripe for consideration.

## II.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Vaccine Injury Table (the "Table").  Section 11(c)(1)(C)(i). The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). If a claimant establishes that he has suffered a "Table Injury," causation is presumed.

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

In *Cucuras*, the Federal Circuit explained that "greater weight should be accorded" to information contained within the medical records than statements made which are in direct conflict with the contemporaneous documentary evidence. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." 993 F.2d at 1528.

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014). The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *LaLonde*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

Effective for petitions filed beginning on March 21, 2017, SIRVA is an injury listed on the Vaccine Injury Table. *See* Vaccine Injury Table: Qualifications and Aids to Interpretation.  42 C.F.R. § 100.3(c)(10). The criteria are as follows:

4

A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following: (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection; (ii) Pain occurs within the specified time-frame; (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

*Id.*

## III.   Relevant Factual Evidence

### A. Medical Evidence

Petitioner's prior medical history was non-contributory. At age 48, Petitioner received the subject flu vaccine in her left shoulder on October 1, 2018. Ex. 1 at 1.

On October 23, 2018 (22 days post vaccination), Petitioner visited her primary care provider ("PCP"), complaining of "[l]eft shoulder discomfort x2 weeks, [and that it] hurts to do things overhead." Ex. 7 at 15. Petitioner did not report a "fall or known injury." *Id.* She exhibited tenderness of the left scapular bursae and left posterior shoulder bursae. *Id.* at 16. The PCP assessed Petitioner with shoulder bursitis. *Id.*

Approximately a month and a half post-vaccination, on November 16, 2018, Petitioner returned to her PCP complaining that her "[left] shoulder [was] persistent[ly] sore, aching, [and it] hurts to [abduct] overhead, no fall or trauma x3 wks." Ex. 11 at 8. A physical examination showed tenderness of the left shoulder bursa and that Petitioner was using her trapezius muscles for lifting. *Id.* at 9. The PCP's assessment of bursitis remained unchanged, and Petitioner received a steroid injection in her left shoulder. *Id.*

The records then reveal an approximate eleven-month gap in Petitioner's treatment for left shoulder pain. On October 9, 2019, Petitioner returned to care and visited an orthopedist complaining of "L shoulder pain since flu shot fall 2018." Ex. 9 at 12. Petitioner stated she "[n]ever had a shot that hurt that bad – then developed soreness lasting several weeks." *Id.* She described her prior treatment course and noted that the cortisone shot "helped for 4-6 months" but her shoulder was "[g]radually hurting again." *Id.* Petitioner "report[ed] that symptoms began 1 yr [sic] ago." *Id.* A physical examination

showed diminished range of motion ("ROM") and positive impingement signs. *Id.* at 13. Petitioner was assessed with left shoulder adhesive capsulitis; she received a repeat steroid injection and was referred to physical therapy ("PT"). *Id.*

On October 22, 2019, Petitioner attended her initial PT evaluation. Ex. 4 at 18. Petitioner reported the date of onset as "09/22/2018[.] No new aggravation/injury." *Id.* Three weeks of PT was recommended. *Id.* The records for this visit do not contain more detail.

Petitioner followed up with her orthopedist on November 11, 2019. Ex. 9 at 9. The visit notes reflect the same description of left shoulder pain beginning after the flu shot in 2018 as her prior visit in October. *Id.* The orthopedist assessed Petitioner with adhesive capsulitis and a possible rotator cuff tear. *Id.* at 10. He also noted Petitioner was performing an at-home exercise program "but [it] seems to be irritating – so now only stretching." *Id.* at 11. Petitioner was referred for an MRI, which showed moderate tendinosis, mild arthrosis, and "synovial thickening subacromial/subdeltoid bursa, compatible with mild bursitis." *Id.* at 11, 18.

Following her MRI, Petitioner had an orthopedic follow up on November 25, 2019. Ex. 9 at 6. She reported that her October steroid injection "worked for a few weeks." *Id.* Based on her MRI findings and clinical examination, Petitioner received a repeat steroid injection and was given another referral to PT. *Id.* at 8.

Petitioner attended three additional PT sessions and was discharged on December 27, 2019. Ex. 2 at 9, 14, 16. The discharge summary states that the "initial onset [of Petitioner's injury] was mid sept [sic] when she got a flu shot, she started having pin [sic] right after." *Id.* at 9. Petitioner reported that she was "basically pain free" and the therapist noted that Petitioner was "now fully functional with very minor pain." *Id.* She also reported that she was "back to were [sic] [she] was before[.]" *Id.* The therapist noted that Petitioner had met all of her goals and she "completed [the] current program." *Id.* at 10.

Roughly four-and-a-half months later, on May 6, 2020, Petitioner returned to her orthopedist. Ex. 8 at 18. The same description and history of Petitioner's injury appears in the visit notes for this encounter. *See id.* The orthopedist maintained his assessment of arthropathy, adhesive capsulitis, and impingement; Petitioner received a repeat steroid injection. *Id.* at 20.

After another five-month gap in treatment, on October 7, 2020, Petitioner had a telehealth visit with a spine and sports medicine specialist. Ex. 6 at 3. Petitioner stated she had a "two-year history of left shoulder pain, was acute onset immediately after

receiving her flu vaccine on 10/1/18." *Id.* She reported that the pain continued and "has remained present throughout that time." *Id.* Petitioner also noted her first steroid injection "lasted around six months" but the relief she experienced with her repeat injections did not last as long. *Id.* Upon examination, Petitioner exhibited "near full active [ROM] . . . but . . . pain on the left with anything overhead" and across her body. *Id.* Petitioner was assessed with a "[p]robable shoulder injury related to vaccine administration (SIRVA)." *Id.* at 4.

Petitioner had an in-person follow-up visit with the sports medicine office on November 3, 2020. Ex. 6 at 5. Petitioner reported that she had a left shoulder flu injection "in 2018[;]" she experienced "persistent pain and saw her [PCP] two weeks later." *Id.* The steroid injection she received provided six months of relief, according to Petitioner. *Id.* The treater noted that "[s]ymptoms were present at six months." *Id.* Petitioner was assessed with vaccination-related shoulder dysfunction and mild impingement of the left shoulder. *Id.* The treater noted that Petitioner's recent MRI showed a bony cyst near the infraspinatus tendon. *Id.* Petitioner received a repeat steroid injection. *Id.* at 6.

On April 22, 2021 (now approximately five-and-a-half months since Petitioner's last visit for left shoulder pain), Petitioner returned to the office of the sports medicine specialist and received another steroid injection for her ongoing pain. Ex. 14 at 8. The next day, Petitioner underwent a debridement procedure of the tendon and bony cyst present on MRI. *Id.* at 7.

One month later, on May 11, 2021, Petitioner reported to the sports medicine specialist that her "postsurgical pain appears to have resolved." Ex. 14 at 6. However, she still had pain when she raises her arm "overhead in front or behind her." *Id.* By the following month, on June 1, 2021, Petitioner complained that "the left shoulder ha[d] not improved since [her] procedure five weeks ago." *Id.* at 4. Specifically, "[n]either the pain nor the function ha[d] improved." *Id.* A physical examination revealed diminished ROM and Petitioner received a repeat steroid injection. *Id.* at 5. Petitioner received additional steroid injections for ongoing left shoulder symptomology in September 2021 and May 2022. Ex. 16 at 3; Ex. 18 at 5-6. No additional medical records have been filed.

## B. Affidavit Evidence

In her witness declaration, signed on January 12, 2021, Petitioner attests that upon receiving the subject vaccination on October 1, 2018, she "immediately felt a strong, burning sensation unlike anything [she has] ever experienced after getting a vaccine." Ex. 10 ¶ 3. Petitioner assumed the pain "would last for a few days." *Id.* ¶ 4. However, "a week went by" and she was still experiencing pain, prompting her to seek medical care. *Id.* ¶ 5. She described her initial visits and noted that her first cortisone shot "actually helped." *Id.*

¶¶ 6-7. She stated that "in approximately May of 2019, the cortisone shot started to wear off and the pain slowly began to return." *Id.* ¶ 8. By the end of August 2019, Petitioner sought a referral to an orthopedist for her ongoing left shoulder symptoms; she was unable to get an appointment before October 2019. *Id.* ¶ 10. Petitioner explained that she did not seek continued care before August 2019 despite ongoing pain because she was "incredibly busy" preparing her children to leave home. Ex. 24 ¶¶ 7-10. Instead, she used over-the-counter pain killers, ice, and heat to manage the pain during this time. *Id.* ¶ 11.

Petitioner's husband recalls that on October 1, 2018, he "came home from work and found [his] wife in discomfort[,]" she told him that she was experiencing "extreme pain" from her flu vaccination she received "earlier that day." Ex. 20 ¶¶ 2-3. "That night," he witnessed Petitioner being "protective of her shoulder, holding it at times and struggling to find a position that was comfortable." *Id.* ¶ 6.

Additionally, Petitioner's son attests that he received a flu vaccine along with Petitioner, and that he witnessed Petitioner make "an immediate facial reaction of pain" upon receiving the vaccination. Ex. 21 ¶ 6. He recalls that Petitioner had a difficult time driving them home from the shot, as she kept "wincing and rubbing the area where the shot was administered." *Id.* ¶ 8. When they got home, he recalls getting Petitioner an ice pack for her shoulder pain. *Id.* ¶ 9. He states that Petitioner's pain has continued since receiving the flu shot. *Id.* ¶¶ 10, 14.

Two of Petitioner's friends also submitted witness declarations on her behalf. The first attested that Petitioner received the subject vaccination "[a] little over four years ago," and that she experienced pain "immediately afterwards." Ex. 22 ¶ 2. According to this friend, Petitioner's pain "continues to this day." *Id.* ¶ 4. The second friend recalls that "when [Petitioner] first received her flu vaccination[, s]he told [her] that it was an incredibly painful injection[.]" Ex. 23 ¶ 3. Additionally, "over the days that followed[,]" Petitioner had not experienced any relief. *Id.* ¶ 4. According to this friend, Petitioner's pain is ongoing. *Id.* ¶ 6.

Additionally, Petitioner's PCP authored a letter on Petitioner's behalf. Ex. 19 at 1. Her PCP wrote that Petitioner "was seen . . . today [January 30, 2023,] for a medical appointment." *Id.* The PCP stated that "[a]lthough the filed record does not reflect this, [the treater does] recall that during [Petitioner's] 1st visit . . . in relation to her shoulder pain on October 23, 2018, [Petitioner] reported that her pain immediately began after the administration of the flu shot on October 1, 2018." *Id.*

## IV.    Findings of Fact

### A.  Factual Findings Regarding Onset

A petitioner alleging a SIRVA claim must show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)), and that her pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)). Respondent argues that Petitioner is unable to meet this requirement because the contemporaneous medical records at Petitioner's first post-vaccination visit and thereafter place onset outside the 48-hour window. Resp. at 2. Respondent discounts the weight to be afforded to the letter from Petitioner's treating physician and witness declarations, arguing that they were drafted in support of litigation. *Id.*

I find Respondent's arguments regarding onset to be persuasive and that the totality of the record supports the conclusion that Petitioner's shoulder pain most likely did not begin within 48 hours of receiving her October 1, 2018 flu vaccination. What proves most detrimental is the fact that when the medical records reference the onset of her left shoulder pain, they place onset *more than a week* post-vaccination (at the *earliest*), and they do not link the pain to the subject vaccination either.

For example, during Petitioner's first post-vaccination visit on October 23, 2018, Petitioner reported shoulder discomfort "for x2 weeks" – or since roughly October 9, 2018, and she did not attribute her pain to a "fall or known injury." Ex. 7 at 15. More so, at her next visit on November 16, 2018, Petitioner reported that her pain had been present for "x3 wks" [sic] (which places onset around October 26, 2018) and thus outside the 48-hour window. Ex. 11 at 8. Petitioner again did not link her pain to a known injury or event. *Id.* at 8-9. Both entries therefore do not provide support for 48-hour onset and, in fact, negate such a finding.

Additionally, some of Petitioner's medical records place onset as beginning as early as in mid-September 2018 (*pre-vaccination*) and are thus inconsistent with any vaccine injury at all. *See,* e.g., Ex. 4 at 18 (an October 22, 2019 PT note listing the date of onset as "09/22/2018"); Ex. 2 at 9 (a December 27, 2019 PT discharge summary describing onset as "mid sept [sic] when she got a flu shot"). But even if they are incorrect, these notations in Petitioner's contemporaneous medical records heavily detract from her ability to establish the Table's 48-hour onset requirement.

The *only* support in the contemporaneous medical records for 48-hour onset is from Petitioner's October 7, 2020 visit, during which she reported a two-year history of left shoulder pain "immediately after receiving her flu vaccine on 10/1/18." Ex. 6 at 3. This

is the first entry in the medical records that describes onset with such particularity, and I find it relevant that it was made over two years post vaccination – and less than three months before the filing of the instant claim. This singular entry does not outweigh the bulk of evidence against 48-hour onset.

Furthermore, the witness declarations submitted by Petitioner and her family/friends are inconsistent with the evidence contained in her contemporaneous medical records – that her shoulder pain began immediately post vaccination – and they accordingly are deserving of less weight. Exs. 10, 20-24. Likewise, there exist reasons to doubt the credibility of the letter drafted by Petitioner's treating physician. The letter was authored on January 30, 2023 – over *four years* post vaccination and *two years* since this claim's initiation. *See* Ex. 19. More so, the treater's letter acknowledges that the filed record from Petitioner's first visit with the treater on October 23, 2018, does not reflect immediate onset of shoulder pain following Petitioner's receipt of the subject flu vaccine; only after the fact does the treater recall a report of immediate onset. *Compare id.* at 1, *with* Ex. 7 at 15. It is thus strains credulity that a treater would – more than four years later – recall a *specific* report of shoulder pain beginning "immediately" after administration of an October 1, 2018 flu vaccination. Thus, the weight of the evidence regarding onset does not favor Petitioner in this case.

### B. Severity

Respondent also questions whether Petitioner has demonstrated that she suffered "residual effects or complications of [the injury alleged] for more than six months after the administration of the vaccine," as required for eligibility under the Vaccine Program. Section 11(c)(1)(D)(i).

There appears to be no dispute that Petitioner received the flu vaccine on October 1, 2018, and she therefore must demonstrate by preponderant evidence that her residual symptoms continued for more than six months thereafter from the onset of her symptoms. *See,* e.g., *Herren v. Sec'y of Health & Hum. Servs.*, No. 13-100V, 2014 WL 3889070, at *2 (Fed. Cl. Spec. Mstr. July 18, 2014); *see also Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4–5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré syndrome resolved less than two months after onset).

To satisfy the six-month requirement, "[a] potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute." *Faup v. Sec'y of Health & Hum. Servs.,* No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). Rather, a petitioner is required to "submit supporting

documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months[.]" *Id.* Although a petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion, the fact that a petitioner has been discharged from medical care before the expiration of the six-month period does not necessarily indicate that there are no remaining or residual effects from his or her alleged injury. *See,* e.g., *Herren,* 2014 WL 3889070, at *3 (finding that a petitioner suffered from residual symptoms that due to their mild nature did not require medical care).

As discussed above, Petitioner's treatment records suggest that the onset of her symptoms did not begin within 48 hours of her October 1, 2018 flu vaccination. Without resolving the approximate date of the onset of her symptoms, however, I will *assume arguendo* (for purposes of resolving severity, only) that the onset of her symptoms occurred at least by October 4, 2018, just beyond two days of vaccination. Therefore, she logically must demonstrate that her left shoulder injury was extant as of April 4, 2019.

Petitioner initially sought treatment for her shoulder injury on October 23, 2018, and continued for only one additional appointment on November 16, 2018 – less than one month later. There is then an *eleven*-month gap in the medical records – to October 9, 2019. Respondent thus maintains that this fact suggests recovery before the April 2019 six-month "deadline." Indeed, Respondent notes that Petitioner waited almost a year before returning to treatment and her later complaints of left shoulder pain have not been established to be "connected with the injury of which [she] first complained." Resp. at 3. Such undisputed facts indeed cast doubt on Petitioner's ability to satisfy the Act's severity requirement.

The record, however, reveals that Petitioner's symptoms *did* continue. Significant to my determination on severity is the fact that when Petitioner returned to care on October 9, 2019, she consistently related her pain back to her flu shot she had received the previous year. Ex. 9 at 12 (reporting "L shoulder pain since flu shot fall 2018" and that her symptoms "began 1 yr [sic] ago"); Ex. 2 at 9 (a December 27, 2019 PT discharge summary noting that the "initial onset was . . . when she got a flu shot, she started having pin [sic] right after."). I have no reason to doubt the accuracy of these records, and I find Petitioner's reports to her treaters worthy of appropriate weight. *See Cucuras,* 993 F.2d at 1528 (finding medical records warrant consideration as trustworthy evidence as they are "generally contemporaneous to the medical events," and "accuracy has an extra premium" because a patient's "proper treatment is hanging in the balance."). Otherwise, the lack of evidence of continuous treatment does not prevent a finding that severity of injury persisted beyond six months of onset. *See,* e.g., *Herren*, 2014 WL 3889070, at *3. Such evidence suggests that Petitioner's vaccine-related pain was ongoing during the gap in treatment, through the April 2019 six-month "deadline."

Furthermore, Petitioner's explanation for why she did not return for treatment during the eleven-month period, despite the existence of pain, was persuasive and supported by the record. Indeed, at Petitioner's last visit before the significant gap in treatment, on November 16, 2018, she received a steroid injection – thus reasonably accounting for a break in continuous treatment. Ex. 11 at 9. More so, Petitioner's later medical records corroborate her affidavit – stating that she experienced approximately six months of relief from said injection. Ex. 9 at 12 (an October 9, 2019 note stating the cortisone injection "helped for 4-6 months" or through May 2019); Ex. 10 ¶¶ 7-8 (stating in her affidavit that the cortisone injection helped and she did not experience "significant pain . . . for about six months" but that pain "slowly began to return" in May 2019). This evidence preponderantly establishes that Petitioner's pain was ongoing through at least May 2019 and thus through the April 2019 deadline.

I must note, however, that I do not rely on Petitioner's 2020 reports to treaters in making my determination regarding severity, for it is likely Petitioner had undertaken efforts to initiate the instant claim by the time of the later reports. Indeed, the specificity with which Petitioner explains her symptoms lasting through the six-month deadline (and other newly recalled details regarding onset) raises suspicion regarding the credibility of such records, and I thus find them to be less reliable. *See,* e.g., Ex. 6 at 5 (a November 3, 2020 note that Petitioner's "[s]ymptoms were present at six months."). Still, such a finding is immaterial, as Petitioner has otherwise satisfied the Act's severity requirement.

Thus, after consideration of the entire record, the evidence supports a finding that severity has been met. (Certainly, however, the lengthy treatment gaps go to damages, assuming Petitioner can substantiate some kind of vaccine injury).

**Conclusion**

Petitioner has not provided preponderant evidence that the onset of her shoulder pain occurred within 48 hours of vaccination. Accordingly, Petitioner's Table SIRVA claim is **DISMISSED.** Nevertheless, a non-Table claim *could* be viable, and I therefore do not opt to dismiss the case in its entirety at this time. Instead, I urge the parties to make one final brief attempt at settlement, since the case will likely be transferred out of SPU shortly so that Petitioner can attempt to establish a causation-in-fact claim.

Petitioner shall file a joint status report stating that she has provided Respondent with a settlement demand for her off-Table claim (and one that takes into account litigative risk in attempting to prove a non-Table SIRVA-like claim), and the parties' efforts towards informal resolution, **by no later than Tuesday, November 19, 2024.** If the parties do not report progress in their efforts, the matter will likely be transferred out of SPU.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master